## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

JUNK FOOD CUSTOM ARCADES, LLC,

      Plaintiff/Counter-Defendant,

              v.

HIT BOX, LLC,

      Defendant/Counterclaimant.

Civil Action No.

2:21-CV-262-RWS

## ORDER

On February 27, 2023, the Court held a hearing to determine the proper construction of the disputed claim terms in United States Patent Nos. 10,022,623 (the "'623 Patent") and 11,369,867 (the "'867 Patent"). The Court has considered the arguments made by Plaintiff / Counter-Defendant Junk Food Custom Arcades, LLC ("JFCA") and Defendant / Counterclaimant Hit Box, LLC ("Hit Box") at the claim construction hearing and in their joint claim construction statement and respective briefs [Dkt. 77, 80, 81, 82, 83, 95, 96]. The Court issues this Claim Construction Memorandum Opinion and Order in light of these considerations.

# BACKGROUND

## I.    Factual Background

JFCA is a Georgia corporation that manufactures and sells gaming controllers and related technology.  Hit Box is a Nevada corporation that designs, manufactures, and sells video game controllers and consoles.  Hit Box specializes in all-button arcade style controllers.  The two companies are competitors in the market for gaming controllers.

On December 6, 2010, Hit Box filed U.S. Patent Application No. 13/312,847 for its game controller.  Dustin and Shawn Huffer were listed as inventors of the controller.  On July 17, 2018, the U.S. Patent and Trademark Office ("USPTO") approved that application, and Hit Box obtained the '623 Patent, entitled "Ergonomically Correct Game Controller."  And, on November 17, 2018, the USPTO issued the '623 Patent.  The '623 Patent discloses and claims an allegedly novel hand operated game controller which utilizes an all-push-button surface with an allegedly novel button arrangement.  The '623 Patent has 15 claims.  Hit Box asserts that claims 1 and 10 are independent, claims 2-9 depend from claim 1, and claims 11-15 depend from claim 10.

In October 2021, Hit Box learned that JFCA intended to offer certain gaming controllers for sale at a CEO gaming convention in December 2021.  Hit

2

Box reviewed JFCA's products and concluded that, in its opinion, certain of those products, including the "Snack Box Micro," "Snack Box V2 Buttons Only Addition," and "Snack Box V2 King Size Buttons Only Addition" infringed one or more claims of the '623 Patent. Accordingly, on November 9, 2021, Hit Box sent a letter to JFCA to notify JFCA of the asserted infringement and ask JFCA to immediately stop its infringement. On November 12, 2021, after a call between the two parties' attorneys, Hit Box provided a claim chart to JFCA showing how it believed JFCA's products infringed at least two independent claims—claims 1 and 10—of the '623 Patent. JFCA ultimately decided not to attend the convention. This lawsuit followed.

During the pendency of this lawsuit, on June 28, 2022, Hit Box obtained the '867 Patent, which is also entitled "Ergonomically Correct Game Controller." The '867 Patent is a continuation of the '623 Patent and a member of the same patent family, and Hit Box's original game controller is covered by both patents. The '867 Patent claims an innovative arrangement of push buttons as an alternative to traditional gaming controllers to provide the user with greater speed and accuracy in order to facilitate the most efficient play. The '867 Patent has 20 claims: claims 1 and 16 are independent, claims 2-15 depend from claim 1, and claims 17-20 depend from claim 16.

## II.    Procedural History

On December 6, 2021, JFCA filed a complaint against Hit Box [Dkt. 1], asserting the following claims: declaratory judgment of invalidity of the '623 Patent (Count I), declaratory judgment of non-infringement of the '623 Patent (Count II), and violation of the Georgia Fair Business Practices Act (the "GFBPA") (Count III).  On February 9, 2022, Hit Box asserted a counterclaim against JFCA for infringement of the '623 Patent [Dkt. 8].  Also on February 9, 2022, Hit Box filed a Motion for Partial Judgment on the Pleadings, asking the Court to enter judgment in its favor pursuant to Federal Rule 12(c) as to Count III—violation of the GFBPA—of JFCA's complaint [Dkt. 9].  JFCA opposed Hit Box's Motion [Dkt. 13] and Hit Box filed a reply in support [Dkt. 19].

On March 16, 2022, JFCA filed its own Motion for Judgment on the Pleadings, arguing that the Court should enter judgment in its favor because the '623 Patent is directed to patent ineligible subject matter (specifically, the abstract idea of an ergonomically correct game controller) and is thus invalid under 35 U.S.C. § 101 and Alice Corporation Pty. v. CLS Bank International, 573 U.S. 208 (2014) [Dkt. 23].  On April 6, 2022, Hit Box opposed JFCA's Motion [Dkt. 33], and on April 19, 2022, JFCA filed a reply in support [Dkt. 36].

Shortly after filing its Motion for Judgment on the Pleadings, on March 25, 2022, JFCA filed its First Amended Complaint, through which it asserted a broader set of claims than its initial Complaint: declaratory judgment of invalidity of the '623 Patent (Count I), declaratory judgment that the '623 Patent was obtained through inequitable conduct and therefore is unenforceable (Count II), declaratory judgment of non-infringement of the '623 Patent (Count III), Section 285 attorneys' fees (Count IV), and violation of the GFBPA (Count V) [Dkt. 30]. JFCA's filing of its First Amended Complaint rendered Hit Box's earlier Motion for Partial Judgment on the Pleadings [Dkt. 9] moot.

On April 15, 2022, Hit Box moved to dismiss several of the claims in JFCA's First Amended Complaint [Dkt. 34]. Specifically, it moved to dismiss Count II pursuant to Federal Rule 12(b)(6) and Count V pursuant to Federal Rule 12(c). JFCA opposed Hit Box's Motion to Dismiss [Dkt. 42], and Hit Box filed a reply in support [Dkt. 47].

The Court held a status conference on July 18, 2022 [Dkt. 53]. During this conference, the parties informed the Court that Hit Box had recently obtained a continuation patent—the '867 Patent—and sought clarity about how to proceed. The parties subsequently agreed on an amended scheduling order permitting the cross-filing of certain supplemental briefing. Accordingly, on July 28, 2022, Hit

5

Box filed its First Amended Counterclaim, through which it asserted counterclaims for infringement of both the '623 Patent (Counterclaim I) and the '867 Patent (Counterclaim II) [Dkt. 58]. And in August, both parties filed supplemental briefings as to JFCA's Motion for Judgment on the Pleadings [Dkt. 62, 63] and then opposed the other party's supplemental briefings [Dkt. 66, 67].

On October 18, 2022, the Court denied both JFCA's Motion for Judgment on the Pleadings and Hit Box's Motion to Dismiss [Dkt. 76]. Following that ruling, the parties filed their Amended Joint Claim Construction Statement [Dkt. 77] and their respective Claim Construction Briefs [Dkt. 80, 81]. Each party opposed the other's brief [Dkt. 82, 83]. The Court held the claim construction hearing on February 27, 2023. Following the hearing, both parties submitted short supplemental briefs regarding one of the disputed terms [Dkt. 95, 96].

## DISCUSSION

### I.    Applicable Law

#### A.    Claim Construction Generally

Patent infringement analysis involves two steps: (1) determining the meaning and scope of the patent claims asserted to be infringed, and (2) comparing the properly construed claims to the accused device. Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), aff'd 517 U.S. 370

(1996) (citation omitted).  The first step—claim construction—is at issue here.

"The construction of patent claim terms is a question of law for the court."

Auction Mgmt. Sols., Inc. v. Adesa Inc., 2007 WL 2698816, at *1 (N.D. Ga. Sept.

11, 2007) (citing Markman, 52 F.3d at 970-71).  The Court construes the claims

consistent with the following instructions from the United States Court of Appeals

for the Federal Circuit.

   "It is a bedrock principle of patent law that the claims of a patent define the

invention to which the patentee is entitled the right to exclude."  Phillips v. AWH

Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citation and quotations

omitted).  Thus, "claim construction analysis must begin and remain centered on

the claim language itself, for that is the language the patentee has chosen to

particularly point out and distinctly claim the subject matter which the patentee

regards as his invention."  Innova/Pure Water, Inc. v. Safari Water Filtration Sys.,

Inc., 381 F.3d 1111, 1116 (Fed. Cir. 2004) (citation, punctuation, and quotations

omitted).

   Generally, the words of a claim are given their "ordinary and customary

meaning," which is "the meaning that the term would have to a person of ordinary

skill in the art in question at the time of the invention, i.e., as of the effective filing

date of the patent application."  Phillips, 415 F.3d at 1312-13 (citations omitted).

In some cases, the meaning of a claim term as understood by someone with skill in the art "may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." Id. at 1314 (citation omitted). In most instances, however, the Court must go further than the readily understood meaning of the words used and look to other sources to aid it in determining the meaning of a particular claim term. Id. "Those sources include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." Id. (citations and quotations omitted).

"[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." Id. (citations omitted). First, "the context in which a term is used in the asserted claim can be highly instructive." Id. Moreover, "[b]ecause claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." Id. (citations omitted).

However, the claims of a patent are not intended to be read in isolation. Id. at 1315. "Rather, they are part of a fully integrated written instrument [] consisting principally of a specification that concludes with the claims." Id. (citation and

quotations omitted).  Because the "claims must be read in view of the specification, of which they are a part, . . . the specification is always highly relevant to the claim construction analysis," and often "is the single best guide to the meaning of a disputed term."  Id. (citation and quotations omitted).  That said, "it is the claims, not the specification, which set forth the limits of the patentee's invention."  Uniloc 2017 LLC v. Google LLC, 2020 WL 569857, at *1 (E.D. Tex. Feb. 5, 2020) (citation omitted).  Thus, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment— into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."  Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 913 (Fed. Cir. 2004) (citations omitted); see also Auction Mgmt. Sols., Inc., 2007 WL 2698816, at *2 ("It is important to note, however, that while claims must be construed in light of the specification, limitations from the specification are not to be read into the claims in the absence of a clear disavowal of claim scope.") (citation omitted).

The prosecution history also plays an important role in claim interpretation as intrinsic evidence of how the USPTO and the inventor understood the patent. Phillips, 415 F.3d at 1317 (citations omitted); see also Microsoft Corp. v. Multi-Tech Sys., Inc., 357 F.3d 1340, 1350 (Fed. Cir. 2004) (noting that "a patentee's

statements during prosecution, whether relied on by the examiner or not, are

relevant to claim interpretation") (citations omitted).  However, "because the

prosecution history represents an ongoing negotiation between the PTO and the

applicant, rather than the final product of that negotiation, it often lacks the clarity

of the specification and thus is less useful for claim construction purposes."  Id.

(citations omitted).

"An analysis of intrinsic evidence is usually sufficient to construe a disputed

claim term."  Calmedica, LLC v. Best Vascular, Inc., 2008 WL 4963047, at *3

(N.D. Ga. June 19, 2008) (citation omitted).  Indeed, "[i]f the intrinsic evidence is

sufficient to resolve disputed claim terms, reliance on any extrinsic evidence is

improper."  Id. (citation and quotations omitted); see also Vitronics Corp. v.

Conceptronic, Inc., 90 F.3d 1576, 1584-85 (Fed. Cir. 1996) ("reliance on

[extrinsic] evidence is unnecessary, and indeed improper, when the disputed terms

can be understood from a careful reading of the public record.  Nor may it be used

to vary claim terms from how they are defined, even implicitly, in the specification

or file history.") (citation omitted).

But "when the meaning of the disputed terms cannot be ascertained from a

careful reading of the public record," Klaustech, Inc. v. Google, Inc., 2016 WL

2957044, at *3 (N.D. Cal. May 23, 2016) (citation omitted), courts may rely on

extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Phillips, 415 F.3d at 1317 (citations and quotations omitted).

As the Supreme Court recently explained:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period.

Teva Pharms. USA, Inc. v. Sandoz, Inc., 574 U.S. 318, 331 (2015) (citation omitted).  Once again, the Federal Circuit has emphasized that such extrinsic evidence is subordinate to intrinsic evidence.  Phillips, 415 F.3d at 1317 ("[W]hile extrinsic evidence can shed useful light on the relevant art, we have explained that it is less significant than the intrinsic record in determining the legally operative meaning of claim language.") (citations and quotations omitted).

During claim construction, "[t]he sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law." Id. at 1324 (citation omitted).

### B.      Indefiniteness

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention.  35 U.S.C. § 112(b).  Accordingly, "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  Nautilus, Inc. v. Biosig Instruments, Inc., 572 U.S. 898, 901 (2014).  "[A] patent must be precise enough to afford clear notice of what is claimed," but that consideration must be made while accounting for "the inherent limitations of language."  Id. at 909.  "Indefiniteness must be proven by clear and convincing evidence."  Sonix Tech. Co. v. Publ'ns Int'l, Ltd., 844 F.3d 1370, 1377 (Fed. Cir. 2017) (citation omitted).

### C.      The Level of Ordinary Skill in the Art

The level of ordinary skill in the art is the skill level of a hypothetical person who is presumed to have known the relevant art at the time of the invention.  In re GPAC Inc., 57 F.3d 1573, 1579 (Fed. Cir. 1995) (citation omitted).  In resolving the appropriate level of ordinary skill, courts "may consider various factors including type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field."  Id. (citation and

quotations omitted).  Importantly, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton."  KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 421 (2007).

## II. Claim Construction

### A. Agreed Claim Terms

The parties have agreed that the below terms should be construed as follows as they appear in the '623 and/or '867 Patents:

| Agreed Upon Terms | Agreed Upon Construction |
|---|---|
| Edge | "the outer perimeter of a surface" |
| Surface | "the upper most areas of the controller" |
| Vertically and linearly adjacent | "next to and aligned above" |
| Comprising ('867 Patent only) | "the '867 Patent's claims are directed to an all-button (i.e., stickless) controller" |
| Symmetrical in Curvature | "having similarly shaped curves" |
| Adjacently spaced | "next to" |
| Side portion | "The area of the surface between the middle boundary and the respective left or right edge." |

[Dkt. 77 – Am. Joint Claim Construction Statement, at 2-3].

**B.    Disputed Claim Terms**

The parties dispute the construction of the following terms in the '623 and/or '867 Patents and have proposed their own constructions.  The Court will address each disputed term, and set forth the meaning of each term, below.

### 1.    "Push Button / Button" (including movement button and function button)

| JFCA Proposed Construction | Hit Box Proposed Construction |
|---|---|
| "(1) A housing, the outside of which lies on the game controller surface, (2) a plunger within the housing, and (3) a switch that can be activated or deactivated by the plunger, (4) which switch is connected to the PCB but <u>not</u> directly attached to the PCB." | Plain and ordinary meaning, which, to a person of ordinary skill in the art ("POSITA"), is "an object that is pressed to send a signal." |

The term "button" appears throughout the claims of both the '623 Patent and the '867 Patent.  The term "push button," however, appears in claims 1, 5, and 10 of the '623 Patent, but does not appear in the claims of the '867 Patent and instead only appears in that patent's specification.

JFCA argues that "button" and "push button" should be construed as: "(1) A housing, the outside of which lies on the game controller surface, (2) a plunger within the housing, and (3) a switch that can be activated or deactivated by the plunger, (4) which switch is connected to the PCB but <u>not</u> directly attached to the

14

PCB." [Dkt. 80 – JFCA Opening Br., at 9-10]. In support of this construction, JFCA references "[n]umerous prior art patents and published patent applications [that] show and describe the specific structural characteristics of 'push buttons' as they are utilized in connection with gaming controllers." [Id. at 11-13]. In addition, JFCA contends that Hit Box's removal of "push" from the term in the claims of the '867 Patent means that "Hit Box disavowed (i.e., forfeited) any meaning of 'button' broader than 'push button' as that term is properly construed in the context of the '623 Patent." [Id. at 13-14].

Conversely, Hit Box argues that the terms "button" and "push button" should be given their plain and ordinary meaning, which, to a POSITA, is "an object that is pressed to send a signal." [Dkt. 81 – Hit Box Opening Br., at 9, 12]. Hit Box notes that "the claims and specification of the asserted patents repeatedly describe buttons and push buttons being pressed to send a signal," and extrinsic evidence such as dictionaries define the terms similarly. [Id. at 10, 12].

The Court finds that Hit Box's proposed construction is supported by the specification. Indeed, both the Abstract and the Summary of the Invention in the '623 Patent states that the push buttons are placed in a particular arrangement, and "[a]s the user presses the buttons, control signals are sent from the buttons to the game console via wiring." ['623 Patent, at Abstract, 1:44-45]. Moreover, Claim 1

15

recites "a connection means between said push buttons and said game console, wherein control signals are sent from said plurality of buttons to said game console via said wireless or wired connection means as said plurality of buttons is pushed by the user." [Id. at 5:4-8].

On the other hand, JFCA's proposed four-part construction has no basis in the intrinsic record and is unduly limiting.  Neither of the terms "housing" or "plunger" are found anywhere in the claims themselves or the specification, and JFCA cites nothing in the record to support its contention that the construction should be so narrow.  Instead, JFCA asks the Court to focus on certain prior art references that it contends support its proposed construction, which is improper when the intrinsic evidence is sufficient to resolve disputed claim terms. Calmedica, LLC, 2008 WL 4963047, at *3 (citation and quotations omitted). Indeed, the Court can only rely on such prior art and extrinsic evidence "when the meaning of the disputed terms cannot be ascertained from a careful reading of the public record," which is not the case here.  Klaustech, Inc., 2016 WL 2957044, at *3 (citation omitted); see also Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC, 57 F.4th 1001, 1010 (Fed. Cir. 2023) ("Where the specification instructs as to the meaning of a claim term, the inventor's lexicography governs.") (citation and quotations omitted).

16

In addition, JFCA's argument that Hit Box disavowed any meaning of "button" broader than "push button" as that term is properly construed in the context of the '623 Patent by removing the word "push" from the term in the '867 Patent is without merit.  "To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a clear and unmistakable surrender." Finalrod IP, LLC v. Endurance Lift Sols., Inc., 2021 WL 2187980, at *5 (E.D. Tex. May 28, 2021) (citations and quotations omitted); see also Thorner v. Sony Comput. Entm't Am. LLC, 669 F.3d 1362, 1366 (Fed. Cir. 2012) ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.) (citations and quotations omitted).  "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." 3M Innovative Props. Co. v. Tredegar Corp., 725 F.3d 1315, 1326 (Fed. Cir. 2013) (citation omitted).  Here, there is no evidence—certainly not any that is clear and unmistakable—that Hit Box intended to disavow the full scope of the term "button."  As such, the Court finds that no disavowal occurred.

Accordingly, the Court construes "button" and "push button" to mean "an object that is pressed to send a signal."

### 2. "Disposed; Disposed on"

| JFCA Proposed Construction | Hit Box Proposed Construction |
| --- | --- |
| "Placed in contact with and supported by the top surface of." | Plain and ordinary meaning, which, to a POSITA, is "located or positioned." |

The terms "disposed" and "disposed on" appear in claims 1 and 10 of the '623 Patent. In the '867 Patent, both terms appear in claims 1, 9, 16, and 20, and the term "disposed" additionally appears in claims 7 and 19.

The parties' opening briefs put forth differing constructions for both of the terms "disposed" and "disposed on." However, JFCA noted that they "may be aligned on what 'disposed' means in the context of the '623 Patent." [Dkt. 80 – JFCA Opening Br., at 4 n.2]. After reviewing Hit Box's opening brief, JFCA stated that it "[could] accept Hit Box's proposed construction to the extent it is a construction of 'disposed' when describing the relative position of the push buttons." [Dkt. 82 – JFCA Opp. Br., at 5]. Accordingly, the term "disposed" will be construed as "located or positioned" in the context of the '623 Patent.

Nevertheless, the parties continue to push for different constructions of the term "disposed on." [Id. at 5-6; Dkt. 83 – Hit Box Opp. Br., at 8-11]. More specifically, they disagree over whether the inclusion of the word "on" transforms the agreed-upon construction of "disposed"—"located or positioned"—into

something more.  Hit Box believes that it does not, and that the term should also be

construed as "located or positioned."  [Dkt. 83 – Hit Box Opp. Br., at 8-11].  JFCA

disagrees, arguing that "disposed on" in the '867 Patent should be construed to

mean "placed in contact with and supported by the top surface of."  [Dkt. 80 –

JFCA Opening Br., at 3-4; Dkt. 82 – JFCA Opp. Br., at 5-6].  It contends that this

construction is supported by dictionary definitions and is "consistent with the

portion of [its] construction of 'push button' that places a portion of the housing on

the gaming surface."  [Dkt. 82 – JFCA Opp. Br., at 5-6].

The Court sees no reason why "disposed on" should have a different

construction than "disposed."  First and foremost, the claim language supports this

conclusion.  In the '623 Patent, the relevant portions of Claims 1 and 10 state as

follows:

> a right movement button disposed between said down
> movement button and said middle boundary line . . ., and
> an up movement button at least partially disposed on said
> middle boundary line . . .

['623 Patent, at 4:41-46, 6:2-6].  Applying the parties' agreed-upon construction

for "disposed," the first segment of this claim language means that the right

movement button is "located or positioned" between the down movement button

and middle boundary line.  But according to JFCA, the second segment, with

"disposed on," should mean something entirely different, specifically that the up

movement button is at least partially "placed in contact with and supported by the top surface of" the middle boundary line.  The claim language provides no support for that differing construction.  Indeed, the only difference in the second segment is the location specificity of the button in question.  In other words, while the right movement button is generally located somewhere between the down movement button and the middle boundary line, the up movement button is actually placed specifically on the middle boundary line.

The claim language in the '867 Patent does not alter that conclusion.  Each of the claims in which "disposed on" appears describes "a first assemblage of buttons disposed on said first side portion for operation with a first hand of a user and a second assemblage of button disposed on said second side portion for operation with a second hand of a user."  ['867 Patent, at 4:47-50, 6:11-14].  When read in context, "disposed on" simply describes the relative location of different buttons: some must be on the left hand side of the console, and some must be on the right hand side.

Simply put, nothing in the claim language or specification limits the construction of "disposed on" to something that is not only "placed in contact with" but also "supported by the top surface of."  Where that is the case, the Court "declines to narrow the definition of the term beyond its plain meaning."  <u>Cormack</u>

20

v. United States, 119 Fed. Cl. 63, 73 (2014); see also Interactive Gift Exp., Inc. v. Compuserve Inc., 256 F.3d 1323, 1343 (Fed. Cir. 2001) ("In this case, nothing in the claim or the specification directly or implicitly requires such a narrow construction.").

Notwithstanding the clarity of the claim language, JFCA still encourages the Court to adopt its own more nuanced, narrower construction, based on dictionary definitions and another of its proposed constructions. Neither of these arguments move the needle. First, the fact that JFCA requests a construction that is consistent with its proposed construction of "button" and "push button" carries no weight, since the Court declined to adopt its proposed construction for those terms. And second, since the intrinsic evidence is sufficient to construe the claim, the Court need not consider extrinsic evidence such as dictionary definitions. Koepnick Med. & Educ. Rsch. Found., L.L.C. v. Alcon Lab'ys, Inc., 162 F. App'x. 967, 972 (Fed. Cir. 2005) (where "intrinsic evidence [is] sufficient to support the claim construction, it [is] not necessary to consider extrinsic evidence") (citation omitted).

Accordingly, the Court construes both "disposed" and "disposed on" to mean "located or positioned."

### 3. "Middle boundary"

| JFCA Proposed Construction | Hit Box Proposed Construction |
| --- | --- |
| "Equally distant from the left and right edges." | Plain and ordinary meaning, which, to a POSITA, is "a dividing line at approximately the midpoint of an area." |

The term "middle boundary" appears 11 times in the '623 Patent, including in claims 1 and 10, and 11 times in the '867 Patent, including in claims 1, 2, 3, 16, and 18. Hit Box argues that the term should be given its plain and ordinary meaning, which, to a POSITA, is "a dividing line at approximately the midpoint of an area." [Dkt. 81 – Hit Box Opening Br., at 13-16]. Hit Box contends that this construction is consistent with the claim and specification language and disclosed embodiments. [Id.]. Conversely, JFCA argues that the term should be construed as "equally distant from the left and right edges," relying primarily on a dictionary definition of "middle." [Dkt. 80 – JFCA Opening Br., at 15-18]. Both parties dispute the other's proposed construction: Hit Box believes that JFCA's construction would require the Court to exclude disclosed embodiments from the scope of the claims and improperly relies on extrinsic evidence, whereas JFCA asserts that Hit Box's construction renders the term and claims indefinite since it

provides no guidance regarding the scope of the claims.  [Id. at 17-18; Dkt. 81 –
Hit Box Opening Br., at 14-15].

The Court begins with the claim language itself.  First, neither of the patents
explicitly define "middle boundary" or either "middle" or "boundary" in isolation.
And when read in context, there is no indication that Hit Box intended for the
boundary to be exactly the same distance from the left and right edges of the
gaming controller.  Indeed, the '623 Patent claims state that the game controller
surface includes "a left hand position extending inwardly from said left edge to
said middle boundary line and a right hand position extending inwardly from said
right edge to said middle boundary line," but nothing more specific than that.
['623 Patent, at 4:28-32].  However, the claims subsequently specify that certain
movement buttons must be "the same distance to said top edge" as each other.  [Id.
at 4:38-41, 5:38-6:2].  Clearly, then, Hit Box recognized that it could claim the
middle boundary as exactly in the middle of the game controller surface, but it
chose not to do so.

Beyond the claim language itself, the embodiments disclosed in both patents
are instructive.  Figures 5 through 10 show different embodiments of the game
controller.  ['623 Patent, at Sheets 3-5; '867 Patent, at Sheets 3-5].  To the Court's
eye, each of the embodiments has a different "boundary" in between the left hand

buttons and right hand buttons, and none appear to be exactly in the middle.  For

example, in Figure 5, the boundary is slightly closer to the left edge of the

controller, whereas in Figure 9, it is closer to the right edge of the controller.  To

adopt JFCA's proposed construction, the Court would have to ignore these

embodiments.  That would be improper, since "[a] claim construction that excludes

an embodiment disclosed by the specification is rarely, if ever, correct."  Finalrod

IP, LLC, 2021 WL 2187980, at *8 (citation and quotations omitted).

Despite the claim language and disclosed embodiments, JFCA nevertheless

contends that the Court should consult dictionary definitions in construing the

term, since the American Dictionary apparently defines "middle" as "equally

distant from extremes or limits."  [Dkt. 80 – JFCA Opening Br., at 16].  There are

a few problems with JFCA's position.  First, an analysis of the intrinsic evidence

here is sufficient to construe the disputed term, and consideration of dictionary

definitions is unnecessary.  Koepnick Med. & Educ. Rsch. Found., L.L.C., 162 F.

App'x. at 972 (where "intrinsic evidence [is] sufficient to support the claim

construction, it [is] not necessary to consider extrinsic evidence") (citation

omitted).  Perhaps more importantly, though, consideration of and reliance on the

particular dictionary definition cited by JFCA would result in a construction that

contradicts the intrinsic evidence here.  And the Federal Circuit has consistently

held that extrinsic evidence like dictionaries "may not be used to vary or contradict the claim language" or to "contradict the import of other parts of the specification." Vitronics Corp., 90 F.3d at 1584 (citation omitted); see also Dow Chem. Co. v. Sumitomo Chem. Co., Ltd., 257 F.3d 1364, 1373 (Fed. Cir. 2001) ("any definition found in or ascertained by a reading of the intrinsic evidence may not be contradicted by any meaning found in dictionaries. . . .") (citation omitted).  The Court therefore will not consider any dictionary definitions for this term.

Accordingly, the Court construes "middle boundary" to mean "a dividing line at approximately the midpoint of an area."

### 4.  "Partially horizontally aligned"

| JFCA Proposed Construction | Hit Box Proposed Construction |
|---|---|
| Indefinite | Plain and ordinary meaning, which, to a POSITA, is "partially aligned along the horizontal axis." |

The term "partially horizontally aligned" appears in Claims 1 and 16 of the '867 Patent, but not the '623 Patent.  The relevant claim language reads as follows:

> said first assemblage of buttons including a top row of only four top function buttons forming a first arcuate shape and a bottom row of only four bottom function buttons forming a second arcuate shape disposed under said first arcuate shape;

> each function button in said bottom row being at least
> <u>partially horizontally aligned</u> with one of said function
> buttons in said top row;

[Emphasis added].

JFCA contends that this term is indefinite because it fails to inform, with reasonable certainty, how a POSITA would understand the top row of function buttons and the bottom row of function buttons to be partially horizontally aligned with each other, particularly because "[a] 'horizontal' relationship normally is a side-by-side relationship," but the rows in question "seem to have a vertical (i.e., one of top of the other) relationship."  [Dkt. 80 – JFCA Opening Br., at 19-20].  In contrast, Hit Box argues that the term "partially horizontally aligned" should receive its plain and ordinary meaning, which, to a POSITA, is "partially aligned along the horizontal axis."  [Dkt. 81 – Hit Box Opening Br., at 20-22].  To support this construction, it cites a reproduced Figure 9 on which it has annotated red reference lines between each of the function buttons on the bottom row (6, 8, 10, and 12) and the corresponding function buttons on the top row (5, 7, 9, and 11), to show how each of the sets of function buttons "share[] a location on the horizontal axis."  [<u>Id.</u> at 21].

The Court finds that this term is indefinite.  First, the claims on their face provide no guidance about the scope of the term, and there is no express definition

of the term in the specification.  Next, the words in Hit Box's proposed

construction—"horizontal axis"—do not appear anywhere in the '867 Patent's

claim language or specification.  Indeed, the first time that phrasing appears is in

Hit Box's proposed construction.  Third, Figure 9 is not nearly as persuasive as Hit

Box would have the Court believe.  The significance of this figure is that the red

reference lines supposedly show the shared horizontal axis between the top and

bottom function buttons.  But the version of Figure 9 that appears in Hit Box's

brief is annotated; the red reference lines did not actually appear in the original

figure in the '867 Patent  ['867 Patent, at Sheet 5].  Finally, when viewed in

context, the disputed term is not used consistently.  For example, Claims 1 and 16

both state at the outset that the game controller comprises "a game controller

surface extending horizontally between left and right edges and vertically between

top and bottom edges."  ['867 Patent, at 4:41-43, 6:3-5].  Then, just a few lines

later, the same claims state "each function button in said bottom row being at least

partially horizontally aligned with one of said function buttons in said top row."

['867 Patent, at 4:56-58, 6:20-22].  The first reference suggests that horizontal

means left to right, while the second reference suggests it means top to bottom.

Such inconsistency can support a finding of indefiniteness.  See, e.g., Infinity

Comput. Prods., Inc. v. Oki Data Am., Inc., 987 F.3d 1053, 1059 (Fed. Cir. 2021)

("Indefiniteness may result from inconsistent prosecution history statements where the claim language and specification on their own leave an uncertainty that, if unresolved, would produce indefiniteness."), Unique Concepts, Inc. v. Manuel, 1986 WL 8039, at *7 (N.D. Ill. July 16, 1986) ("[A] claim which seems definite standing alone can take on an unreasonable degree of uncertainty when read with the specifications.  That happens when, after reading the claims and specifications together, one can no longer tell what the invention is, because the ordinary meaning of the claim language is inconsistent with the description and examples in the specifications.") (citations omitted).

Simply put, nothing in the '867 Patent's claims and specification inform, with reasonable certainty, those skilled in the art about the scope of the term "partially horizontally aligned."  For these reasons, the Court finds that the term "partially horizontally aligned" is indefinite.

### 5.  "Of at least one of a portion"

| JFCA Proposed Construction | Hit Box Proposed Construction |
| --- | --- |
| Indefinite | When read in conjunction with entire claim language, plain and ordinary meaning results, which, to a POSITA, is "the third arcuate shaped buttons (i.e., movement buttons) have similarly |

| | shaped curves to either the first or second arcuate shaped buttons (i.e., the top and bottom rows of function buttons) along the middle boundary." |
|---|---|

Finally, the term "of at least one of a portion" appears only once in either patent—in claim 2 of the '867 Patent, which states as follows:

> The hand-operated game controller of claim 1, wherein said third arcuate shape is symmetrical in curvature of at least one of a portion of said first arcuate shape and a portion of said second arcuate shape along said middle boundary.

At the outset, the Court notes that claim 2 is dependent on claim 1, which has been found to be indefinite, so claim 2 is likewise invalid as indefinite. However, in an effort to be fully exhaustive, and in case the Court's construction and indefiniteness finding are appealed and reversed, the Court nevertheless addresses the disputed term here.

JFCA argues that the term is indefinite, because "[a] single button could be a portion of the 'first arcuate shape,' [b]ut a single button has no arcuate shape much less than one that could be compared to the shape of the 'third arcuate shape' to determine if they are 'symmetrical in curvature.'" [Dkt. 80 – JFCA Opening Br., at 21]. Hit Box disagrees, and instead argues for the term to be construed pursuant to its plain and ordinary meaning, which, to a POSITA, is "the third arcuate shaped

buttons (i.e., movement buttons) have similarly shaped curves to either the first or second arcuate shaped buttons (i.e., the top and bottom rows of function buttons) along the middle boundary." [Dkt. 81 – Hit Box Opening Br., at 22]. Hit Box further argues that the claim language and specification "simply require[] that the buttons on one side of the controller are arranged in a similar shape to the buttons on the opposite side of the controller, while not requiring the shape or number of buttons to be identical." [Id. at 23].

The claim language and specification support Hit Box's proposed construction and argument. Again, the term "of at least one of a portion" appears right before the phrase "said first arcuate shape." Claims 1 and 16 make clear that the "first arcuate shape" is comprised of "a top row of only four top function buttons." ['867 Patent, at 4:51-53, 6:15-17]. Accordingly, reading the disputed term in context, the portion of the first (or second) arcuate shape can comprise some number of buttons less than four, but it must still maintain an arcuate shape. JFCA argues that a "portion" is indefinite because it could encompass a single button, which would not have an arcuate shape. However, this construction ignores the context in which the disputed claim appears and unnecessarily limits the claims, when Hit Box argues that a portion requires at least three buttons to define the arcuate shape. Hit Box's construction is consistent with the disclosed

30

embodiments and the meaning of an "arc" or "arcuate shape," which logically requires at least three points to be fully defined.

Accordingly, the Court finds that JFCA has not shown by clear and convincing evidence that this term is indefinite. Instead, it finds that, when read in context with the entire claim language, the term "of at least one of a portion" should be given its plain and ordinary meaning, which, to a POSITA, is "the third arcuate shaped buttons (i.e., movement buttons) have similarly shaped curves to either the first or second arcuate shaped buttons (i.e., the top and bottom rows of function buttons) along the middle boundary." However, the Court notes that a POSITA would not construe this term as constituting only one button; rather, a POSITA would understand that the term requires at least three buttons to define the symmetric arcuate shape.

## CONCLUSION

The Court adopts the constructions above for the disputed terms of the '623 and '867 Patents. Furthermore, the parties should ensure that all testimony that relates to the terms addressed in this Order is constrained by the Court's reasoning. However, in the presence of the jury the parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this Order that is not an actual construction adopted by the Court.

The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

For purposes of clarity, the Court reiterates the constructions of the disputed terms below:

| Terms | Construction |
|---|---|
| "Button" and "Push button" | "An object that is pressed to send a signal" |
| "Disposed" and "Disposed on" | "Located or positioned" |
| "Middle boundary" | "A dividing line at approximately the midpoint of an area" |
| "Partially horizontally aligned" | Indefinite |
| "Of at least one of a portion" | "The third arcuate shaped buttons (i.e., movement buttons) have similarly shaped curves to either the first or second arcuate shaped buttons (i.e., the top and bottom rows of function buttons) along the middle boundary" |

**SO ORDERED** this 11th day of April, 2023.

_____
**RICHARD W. STORY**
United States District Judge